812 A.2d 1154 (2003)
356 N.J. Super. 432
George BENDER, Petitioner-Appellant,
v.
NEW JERSEY DEPARTMENT OF CORRECTIONS, Respondent-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued October 23, 2002.
Decided January 9, 2003.
*1155 George H. Bender, appellant pro se.
Victoria L. Kuhn, Deputy Attorney General, argued the cause for respondent (Peter C. Harvey, Acting Attorney General of New Jersey, attorney; Nancy Kaplen, Assistant Attorney General, of counsel; Ms. Kuhn, on the brief).
*1156 Stephen W. Kirsch, Assistant Deputy Public Defender, argued the cause for amicus curiae Office of the Public Defender (Yvonne Smith Segars, Public Defender, attorney; Mr. Kirsch, on the brief).
Before Judges KING, LISA and FUENTES.
The opinion of the court was delivered by KING, P.J.A.D.
Appellant George Bender is currently incarcerated at the Adult Diagnostic and Treatment Center (ADTC) in Avenel, Middlesex County. He appeals from a final agency decision of the Department of Corrections (DOC) which deprived him of commutation ("good time") and work credits for his failure to participate in or fully cooperate with the sex offenders' treatment program (SOTP) as required by N.J.S.A. 2C:47-4.1 and 2C:47-8. Among other contentions, he claims that the treatment program compels his self-incrimination in violation of the Fifth Amendment of the Federal Constitution. Because the treatment program may require an inmate to disclose information about crimes for which he may be prosecuted, upon penalty of loss of institutional credits for good time and work, we find that the statutory scheme invades a "liberty interest" protected by the Federal Constitution. This loss of otherwise available credits against his sentence, leading to a longer prison term, is a form of compulsory self-incrimination which does not survive federal constitutional scrutiny. Without providing some type of use immunity, the State cannot compel incriminating disclosures at the expense of loss of freedom through a longer prison term. See McKune v. Lile, 536 U.S. 24, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002).

I
On May 10, 1996 appellant was convicted of two counts of first-degree aggravated sexual assault and two counts of sexual assault for engaging in sexual acts with juveniles, age twelve to sixteen, see N.J.S.A. 2C:14-2. He was declared eligible for the specialized treatment program at the ADTC. N.J.S.A. 2C:47-1. His sentence imposed on May 10, 1996 was a thirty-year base term with a fifteen-year mandatory minimum. Thereafter, he allegedly failed to cooperate with the treatment program, which he is claimed to have attended irregularly. As a result, the Institutional Classification Committee (ICC) imposed a "loss of appropriate commutation time and work credits against the time of his prison term," per N.J.S.A. 2C:47-8. Bender then appealed the loss of these credits to William F. Plantier, the ADTC Administrator. On December 1, 1998 Plantier rejected his appeal, stating: "Your November 21, 1998 request for return of all credits lost by your failure to fully participate in the therapy program is denied."
Bender then filed an appeal with this court and a motion to proceed as an indigent. He claimed that Plantier's decision denying him his commutation and work credits was contrary to his "procedural due process right [resulting] in loss of [a] liberty interest." On March 2, 2000 the DOC filed a motion for a remand to provide further administrative review of the due process claims. We granted this remand motion on March 28, 2000.
The DOC then established a uniform procedure at the ADTC for the loss of commutation and work credits for inmates who fail to fully cooperate with treatment, effective April 1, 2000. The policy provided for notice and a hearing before the ICC. The inmate would have the opportunity to appear at the hearing with counselsubstitute, *1157 if requested. The policy also provided that the inmate could appeal the decision of the ICC in writing to the Administrator of the ADTC.
On April 28, 2000 the ADTC administration advised Classification Officer Ferro that Bender was scheduled for the next ICC meeting to address the remand. Bender was provided with notice the ICC would consider his loss of good time credits at a hearing on May 3, 2000. He was informed he could be present and heard with counsel-substitute. Bender asked for assistance by counsel-substitute, Edward Walker.
At the hearing, the ICC reviewed with Bender and Walker the reason for the hearing, the nature of the proceeding, and Bender's failure to participate in treatment. The ICC reviewed Bender's treatment record which revealed he attended one group therapy session in his first six months at ADTC and less than 50% of his therapy sessions during his second six months.
At the hearing Bender did not present evidence to refute his poor attendance record. Walker admitted Bender was not fully participating in the treatment. Walker stated that Bender believed "he should not have been discredited for not participating in therapy because the treatment service staff was not licensed." On May 4, 2000 Bender was given a notice approving the loss of commutation and work credits because he failed to sufficiently participate in treatment with less than 100% attendance. He was told he could appeal the decision of the ICC to the Administrator. On May 5, 2000 Bender appealed the decision to Acting Administrator Rogers who upheld the decision, stating that Bender provided her with no basis for reversal of the ICC's decision.
Bender filed a motion to return the proceedings to this court on May 30, 2000. The DOC did not oppose Bender's motion.
We had initially considered the matter in the Fall of 2001 but decided to invite the Office of the Public Defender to appear for the pro se appellant on the Fifth Amendment self-incrimination claim. The Public Defender now has briefed and argued that issue. We reconsidered the matter in October 2002.

II
Bender raises several issues on this appeal in addition to his Fifth Amendment and Due Process claims. They are:
1. His therapists have engaged in malpractice by virtue of their lack of professional qualifications in violation of the State Constitution.
2. The ADTC treatment program violated his Fourth and Eighth Amendment rights.
3. The use by the DOC of a "phase" system at the ADTC exceeded administrative authority under N.J.A.C. 10A.
4. The makeup of the ICC violated N.J.A.C. 10A:9-3.1 and 2.
We find these claims have no merit. They are unsupported in the record and do not warrant discussion in a written opinion. R. 1:11-3(e)(1)(D) and (E).

III
Commutation credits, or "good time" credits, are given to an inmate upon his entry into the correctional system. N.J.S.A. 30:4-140; N.J.A.C. 10A:9-5.1. The credits range from 72 days for one year to 3,984 days for 30 years. Work credits are provided to an inmate on an ongoing basis as the inmate continues to work. N.J.S.A. 30:4-92; N.J.A.C. 10A:9-5.1(b). Such remission in sentence time "shall not exceed one day for each five *1158 days of productive occupation, ..." N.J.S.A. 30:4-92. Both commutation and work credits may be taken from an inmate for a variety of reasons, including misconduct, under N.J.S.A. 4:4-140 and N.J.A.C. 10A:9-5.3(a); filing of a complaint deemed frivolous by a court and intended for a malicious purpose and to harass, under N.J.A.C. 10A:9-5.3(b); and failure to fully participate in sex offender treatment, under N.J.S.A. 2C:47 8.
If an offender incarcerated at the ADTC fully cooperates with all treatment offered during that time, then the offender's sentence "shall be reduced by commutation time for good behavior and credits for diligent application to work." N.J.S.A. 2C:47-3(g). (We use the term "good time credits" to include both commutation time for good behavior and credit for diligent application to work.) As an example, according to the progressive commutation schedule, a thirty-year maximum sentence can be reduced by a maximum of 3,984 days for "continuous orderly deportment." A fifteen-year sentence can be reduced by a maximum of 1,632 days for good behavior. N.J.S.A. 30:4-140. In addition, as noted, inmates can receive remission of time up to one day for every five days of "productive occupation." N.J.S.A. 30:4-92. However,
a term of imprisonment imposed on a person confined to the Adult Diagnostic and Treatment Center ... shall not be reduced by progressive time credits or credits for diligent application to work and other institutional assignments for any year or fractional part of a year if the person failed to fully cooperate with all treatment offered to him during that time period.
[ N.J.S.A. 2C:47-8].
Bender argues that he was not informed that N.J.S.A. 2C:47-8 applied to him, and he was deprived of his federal due process rights. He contends that this statutory penalty was not part of the inmate orientation sessions provided by N.J.A.C. 10A:8-2.4 to inform inmates of their rights and available services. Bender also contends he was denied a meaningful hearing before his good time credits were revoked. Finally, he claims that he was denied the due process protection of the New Jersey Constitution.
The removal of "good time" credits from an inmate implicates a protected liberty interest. Inmates subjected to that penalty have a right to due process protection. Wolff v. McDonnell, 418 U.S. 539, 555, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). In New Jersey, an inmate has certain procedural rights before losing "good time" credits:
(1) Written notice of the charges;
(2) An impartial tribunal;
(3) A limited right to call witnesses and present evidence;
(4) A limited right to confront and cross-examine adverse witnesses;
(5) A right to a written statement of the evidence relied on and reasons for the sanctions imposed;
(6) Provision of counsel-substitute.
[Avant v. Clifford, 67 N.J. 496, 525-529, 341 A.2d 629 (1975).]
Recognizing Bender's initial procedural due process contention, the DOC moved to remand the case for further review, and prepared a "uniform procedure" for denial of commutation and work credits for inmates who fail to participate fully in treatment. As noted, Bender was provided with notice and a hearing before the ICC where he was represented by a counsel-substitute.

IV
The State first contends that because the Fifth Amendment self-incrimination *1159 issue was not raised at the administrative level, we should decline to entertain it. The State also contends that appellant has not exhausted his administrative remedies on this claim. Appellant raises a constitutional question, not implicating agency expertise. In such circumstances, the exhaustion requirement is relaxable. Pressler, Current N.J. Court Rules, comment 2 on R. 2:2-3(3) (2002); see Sanchez v. Dept. of Human Servs., 314 N.J.Super. 11, 32, 713 A.2d 1056 (App.Div.1998). Moreover, we anticipate the issue will recur and requires prompt judicial resolution.
We are satisfied that the Supreme Court's decision in McKune v. Lile, 536 U.S. 24, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002), decided last June prohibits the State from extracting information from an inmate about his past criminal history, not the subject of a conviction, under penalty of loss of good time and work credits, thus effectively extending his prison term. We conclude that denial of such credits, to the extent that the sanction is imposed under N.J.S.A. 2C:47-8 and the SOTP for refusal to answer questions about a criminal history, for which a defendant potentially may face prosecution, violates the Fifth Amendment of the federal constitution which states that "no person ... shall be compelled in any criminal case to be a witness against himself,...." U.S. Const. amend. V. The privilege against self-incrimination was established "as part of the criminal law's shaping of a true accusatorial system," and was a reaction to the courts of High Commission and Star Chamber, among other abusive practices in England. LaFave, Israel & King Criminal Procedure, § 8.14(b) at 289 (West 1999). The privilege "reflects many of our fundamental values and most noble aspirations" including "our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt." Murphy v. Waterfront Commission, 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed. 2d 678, 681 (1964).
In McKune v. Lile, a 4-1-4 decision, the United States Supreme Court recently approved the Kansas sex offenders program which inflicted certain institutional sanctions for non-cooperation with the program but stopped short of penalties which imposed more prison time for refusing to admit or discuss past crimes not the subject of convictions. In upholding the Kansas program, Justice Kennedy spoke for the plurality (Justices Rehnquist, Scalia and Thomas); Justice O'Connor concurred, as the swing vote to create a majority; Justice Stevens spoke for the minority of four (Justices Souter, Breyer and Ginsburg).
As part of the Kansas Sexual Abuse Treatment Program (SATP) participating inmates were "required to complete a sexual history form which detailed all prior sexual activities, regardless of whether such activities constituted uncharged criminal offenses. A polygraph was used to verify the accuracy and completeness of the offender's sexual history." Id., at 2023, 153 L.Ed.2d at 55. Although there was no evidence before the Court that incriminating information has ever been disclosed under that program, "the release of [such] information is a possibility," the plurality observed. Ibid. Justice Kennedy summarized the factual and procedural context of McKune v. Lile, 122 S.Ct. at 2023, 153 L.Ed.2d at 55, this way:
Department officials informed respondent that if he refused to participate in the SATP, his privilege status would be reduced from Level III to Level I. As part of this reduction, respondent's visitation rights, earnings, work opportunities, ability to send money to family, canteen expenditures, access to a personal television, and other *1160 privileges automatically would be curtailed. In addition, respondent would be transferred to a maximum-security unit, where his movement would be more limited, he would be moved from a two-person to a four-person cell, and he would be in a potentially more dangerous environment.
Respondent refused to participate, in the SATP on the ground that the required disclosures of his criminal history would violate his Fifth Amendment privilege against self-incrimination. He brought this action under 42 USC § 1983 [42 USCS § 1983] against the warden and the secretary of the Department, seeking an injunction to prevent them from withdrawing his prison privileges and transferring him to a different housing unit.
[McKune, 122 S.Ct. at 2023, 153 L.Ed.2d at 55.]
The plurality found: (1) the Kansas program was supported by the legitimate penalogical objective of rehabilitation, (2) the State's refusal to offer legal immunity from prosecution on the basis of statements made in the course of the program did not render it invalid, and (3) the element of compulsion was lacking because the adverse consequences for not participating were related to the program's objectives and did not constitute atypical and significant hardships in relation to the ordinary incidents of prison life. In sum, the cost to the inmate of exercising his Fifth Amendment privilege was not so significant or compulsory as to give rise to a constitutional claim. Justice Kennedy stated:
The consequences in question herea transfer to another prison where television sets are not placed in each inmate's cell, where exercise facilities are not readily available, and where work and wage opportunities are more limited are not ones that compel a prisoner to speak about his past crimes despite a desire to remain silent. The fact that these consequences are imposed on prisoners, rather than ordinary citizens, moreover, is important in weighing respondent's constitutional claim.
[Id. at 2026, 153 L.Ed.2d at 58-59.]
Of considerable significance to our decision, Justice Kennedy carefully observed:
In the present case, respondent's decision not to participate in the Kansas SATP did not extend his term of incarceration. Nor did his decision affect his eligibility for good time credits or parole. 224 F.3d at 1182. Respondent instead complains that if he remains silent about his past crimes, he will be transferred from the medium security unitwhere the program is conducted to a less desirable maximum security unit.
[Id. at 2027, 153 L.Ed.2d at 60.]
Justice O'Connor's swing vote provided a decisional majority; she also did "not believe that the alterations in respondent's prison conditions as a result of his failure to participate in the Sexual Abuse Treatment Program (SATP) were so great as to constitute compulsion for the purposes of the Fifth Amendment's privilege against self-incrimination." Id. at 2033, 153 L.Ed.2d at 57. She did expressly conclude that penalties which created longer incarceration for exercise of the Fifth Amendment privilege went over the constitutional line, stating:
The penalties potentially faced in these [penalty] caseslonger incarceration and executionare far greater than those we have already held to constitute unconstitutional compulsion in the penalty cases. Indeed, the imposition of such outcomes as a penalty for refusing to incriminate oneself would surely implicate a "liberty interest."
*1161 [Id. at 2034-35, 153 L.Ed.2d at 69.]
The exaction of a penalty of "longer incarceration" for remaining silent about prior sexual history thus appears beyond the constitutional pale, according to at least six members of the United States Supreme Court.
Of course, in McKune v. Lile, the minority of four, through Justice Stevens, sternly rejected the plurality's conclusion and Justice O'Connor's distinction between "longer incarceration" and other institutional penalties. Justice Stevens said:
Based on an ad hoc appraisal of the benefits of obtaining confessions from sex offenders, balanced against the cost of honoring a bedrock constitutional right, the plurality holds that it is permissible to punish the assertion of the privilege with what it views as modest sanctions, provided that those sanctions are not given a "punitive" label. As I shall explain, the sanctions are in fact severe, but even if that were not so, the plurality's policy judgment does not justify the evisceration of a constitutional right. Despite the plurality's meandering attempt to justify its unprecedented departure from a rule of law that has been settled since the days of John Marshall, I respectfully dissent.
[Id. at 2036, 153 L.Ed.2d at 70.]
The minority expressed that "the program's laudable goals, however, do not justify reduced constitutional protection for those ordered to participate." Id. at 2043, 153 L.Ed.2d at 79. The minority thought "the most obvious alternative is to grant participants use immunity." Id. at 2043-44, 153 L.Ed.2d at 80. The program's "rehabilitative goals" would probably be furthered by promoting "free and open discussion" without the threat of prosecution stemming from a participant's statements in therapy sessions. Id. at 2043-44, 153 L.Ed.2d at 80. We must conclude that a majority of the Supreme Court, based on the expressions in McKune v. Lile, would condemn the sanction of a longer term of incarceration for exercise of the privilege if an inmate declines to discuss past crimes, not the subject of convictions, in therapy. On a fifteen-year sentence, the inmate could lose 1,632 days commutation time; on a thirty-year sentence, the loss is 3,984 days. This is an addition of substantial hard time, not a loss of prison privileges and amenities. Accord, Weaver v. Graham, 450 U.S. 24, 33-34, 101 S.Ct. 960, 966-967, 67 L.Ed.2d 17 (1981) (statute reducing number of good-time credits available to prisoners had effect of delaying release on parole and was a punitive measure which could only be applied to cases involving criminal conduct occurring on or after its effective date).

V
With this understanding of the applicability of the privilege against self-incrimination to the inmate's "liberty interest," we admit great difficulty applying the principle to the facts of this particular case because appellant never explicitly claimed the privilege during his "course of treatment" or during the administrative proceedings. The DOC claims that appellant was penalized by loss of credits against his sentence only because he did not attend the program at all over a considerable period of time or only sporadically for another period. The DOC insists he was not penalized for refusing to disclose and discuss past crimes.
We remand for a new administrative hearing where the appellant may assert the privilege and contend that the penalty imposed is unsupportable by evidence other than his refusal to disclose information about past offenses not the subject of convictions. The agency decision-maker may evaluate this fresh presentation *1162 of the matter and provide detailed findings and conclusions based on reasons independent of the claim of privilege for the penalties, if so imposed. The hearing should be transcribed on tape so that a record is available to us in the event of a further appeal. The inmate cannot be docked otherwise available credits solely because of his claim of privilege. But he cannot avoid participating in and cooperating with an otherwise non-incriminatory treatment program simply because he asserts a claim of privilege.
Finally, the DOC's reliance on the appellant's right to claim a privileged communication under the psychologist and client privilege, N.J.S.A. 45:14B-28; N.J.R.E. 505, or the pertinent regulations, N.J.A.C. 10A:16-44; N.J.A.C. 10A:22-1.1 to 10A:22-2.12, relating to confidentiality of inmates' records, does not trump his federal claim of the privilege against self-incrimination. The Fifth Amendment constitutional privilege is broader than the state statutory or regulatory privileges, and is not subject to the same exceptions or security concerns. See State v. Snell, 314 N.J.Super. 331, 338, 714 A.2d 977 (App.Div.1998) (exception for N.J.S.A. 9:6-8.10 obligation imposed upon "any person" to report evidence of child abuse to DYFS). The constitutional privilege against self-incrimination does not yield in this circumstance to anything short of coextensive use immunity, which the executive or legislative branches have not provided. United States v. Hubbell, 530 U.S. 27, 37-40, 120 S.Ct. 2037, 2043-44, 147 L.Ed.2d 24, 36-38 (2000); New Jersey v. Portash, 440 U.S. 450, 459, 99 S.Ct. 1292, 1297, 59 L.Ed.2d 501, 510 (1979).
For the sake of completeness, we comment on the DOC's explanation of its SOTP. The DOC says in its brief that inmates are encouraged to discuss their sexual proclivities, thoughts and feelings but at no time are they required to admit guilt or discuss specific details regarding the offense for which they stand convicted or to provide specific details of "other past sexual misdeeds that could lead to criminal prosecution nor are they encouraged to do so." An inmate is "encouraged to discuss his behavior but not required to provide identifying information, such as names, relationship, places or time frame, that could lead to prosecution." The State in its brief assures us that:
[P]ursuant to N.J.S.A. 2C:47-8, work and/or commutation credits are only removed from an inmate's term of imprisonment if the inmate fails to fully cooperate with all treatment offered to him. (Graffin Certification ¶ 10). Inmates are advised that the determination of "full cooperation" is based on attendance and the quality of participation, and not the information that is disclosed during therapy. More specifically, other than excused absences, such as medical illness, inmates are expected to attend 100 percent of the treatment sessions (Graffin Certification ¶ 12). Moreover, although inmates are not required to admit guilt or divulge deviant behavior, inmates are required to participate at a level commensurate with their cognitive ability. (Graffin Certification ¶ 13). In other words, an inmate is deemed to be cooperating in treatment if he is working adequately in therapy but does not disclose specific deviant behavior that could lead to prosecution (Graffin Certification ¶ 13). Only those individuals who either fail to attend treatment sessions and/or refuse to participate in treatment are subject to the penalties imposed in N.J.S.A. 2C:47-8, loss of work and commutation credits, and/or N.J.S.A. 2C:47-4.1, transfer out of the Adult Diagnostic and Treatment Center. (Graffin Certification ¶ 14).
However, the workbooks given to the inmates suggest a different theme. For *1163 example, some of the therapy exercises require specific details about past sexual experiences.
What is Sexual Assault?
How many victims have you hadnot how many convictions, counts, charges how many victims? Describe by first name only, age. How did you sexually abuse them?
Describe what you did during the sexual assault, in detail. Describe how you set up your victim, manipulated, coerced or forced them.

* * * * *
RECOGNIZING YOUR DEVIANT CYCLE:
You may be aware of your deviant cycle at this time. You will need to carefully study your various offensesall of them, not just those that you were caught committing. Then you will need to figure out what those acts had in common. Look at some of the factors relating to the victims.
The sex of my victims was: They were all between ____ and ____ years of age. They shared the following physical characteristics. They shared the following personality characteristics. I choose them because. I offended in the following physical environment (list as many as necessary). I offended between the following times.
[Bender Appendix A"Facing The Shadow" pages 6,20]
The DOC assures us that the inmate can "opt out" of answering these questions and is so advised. The record is unclear on this assurance.
Again, we stress that the inmate cannot be deemed uncooperative with the program and lose credits at the cost of invoking his historic, bedrock privilege against self-incrimination. This result is compelled by McKune v. Lile and the SOTP must be administered to comply therewith. In view of our ruling on federal constitutional grounds, we decline to entertain the State constitutional claim.
Remanded for further administrative proceedings.